*Robert A. Nester*
*12291 Pebblepointe Pass*
*Carmel, IN 46033*

September 30, 2015

Counsel,

I am an independent consultant working with Expert Aviation Consulting, LLC.  I have been retained by counsel for Charles Stark and his wife, Sally Stark in connection with litigation following an injury to Mr. Stark while a passenger on United Express Airlines Flight 4179 on October 12, 2012, to provide analysis and expert testimony.

I was employed by the Federal Aviation Administration (FAA) from 1996 to 2007.  In my eleven years with the FAA, I served as a Principle Operations Inspector, an Assistant Principle Operations Inspector, and an Aircrew Program Manager for international and domestic Part 121 certified airlines.  My duties included overall surveillance of air carrier operations; review, approval and monitoring of air carrier manuals and training programs; check airman oversight; designee training; and surveillance of all ground and station operations.

I have approximately 26,000 hours of total flight time and I am type rated in the B-757; B-767; DC-8; DC-9; DC-10; FK-100 and L-1011.

My qualifications are further summarized in my curriculum vitae, attached to this report as Exhibit 1.

I am being compensated at the hourly rate of $225 for time spent on this case. My compensation is not contingent on my findings or the outcome of this litigation.

**Summary of Opinions**

I have relied on (1) my 50 years of professional experience which includes serving as an airline captain, co-pilot and flight engineer of five different airlines; as a command pilot and commander with the United States Air Force and Air Force Reserve for 37 years; and in my employment with the FAA, I performed in positions of Principle Operations Inspector, Assistant Principle Operations Inspector, and Aircrew Program Manager on three different airline certificates; (2) my education, knowledge, and training; and (3) my review and analysis of materials produced in this litigation, to arrive at the following opinions:

1. On the date of the injury, Air Serv Corporation ("Air Serv or "contractor"), acting as a contractor for United Airlines, Inc. ("United" or "carrier"), failed to comply with CFR 14, Part 382.81

   a. Mr. Stark was not provided proper seating accommodations for a person who has identified himself as having a disability as required in FAR 382.81.

      i. Contrary to CFR 14, Part 382.81(a), Mr. Stark was not put in a seat with a movable armrest. Seat 1A, a bulkhead seat, does not have a movable armrest and Mr. Stark was not informed of this.

      ii. CFR 14, Part 382.81(d) would not apply to Mr. Starks's situation as he was expecting an aisle chair transfer and his leg was not immobilized.

   b. The contractor did not use and abide by their established training curriculum and therefore did not comply with CFR 14 Part 382.141 (1) (i) (ii) (iii).

   c. The carrier failed to ensure the contractor was properly trained to proficiency and therefore did not comply with CFR 14 Part 382.141(a)(1)(6).

2. On the date of the injury, Air Serv, acting as a contractor for United Airlines, failed to follow established company procedures deplaning Mr. Charles Stark, a passenger with a disability on Flight 4197 from Shreveport, LA to Houston International Airport, Texas

   a. Air Serv did not ensure two (2) Vendor Service Representatives are used when a customer is unable to assist in their own transfer to/from an aisle chair, as required by the Air Serv Agreement, Exhibit A, Scope of Service Summaries, Passenger Handling Safety, Item M.

      i. The Delta Gate Service (DGS) agent claims only one Air Serv employee was at the gate initially but a second came at a later, unspecified time. The DGS agent was at best an observer, as he is not mentioned as being present in other reports

on the incident or seen by the Starks prior to the injury, nor did he confirm in his deposition that he did anything other than observe.

ii. United Express Flight Attendant, Ms. Michelle Mathis, confirms that there was only one Air Serv Employee at the gate initially in her deposition on observing a wheelchair guy using his cell phone or a walkie-talkie type device prior to Mr. Stark trying to use his walker when she answered, "I believe after, to call for a second person, but not- I don't know about before."

iii. Air Serv Employee Whitney Lott wrote in her personal statement that when she arrived Mr. Stark had already fallen.  In depositions I have read, no one puts a second Air Serv agent on the aircraft prior to the fall.

b. Air Serv did not make available an Aisle Chair when requested by the passenger nor use an Aisle Chair to move a passenger off the aircraft as required by their training program. Air Serv should have waited for the aisle chair to arrive and communicate this to Mr. Stark.

i. While the DGS agent claims a chair was available in his statement, both Mr. and Mrs. Stark, the Flight Attendant, Captain and Air Serv Interrogatories indicate there was not an aisle chair available at the gate in Houston nor would Air Serv acquire an aisle chair after Mr. and Mrs. Stark again requested one in Houston.

ii. DGS agent testifies in his deposition that aisle chairs are not stored on the jetway at gate A8.  He also states there was not an aisle chair present when the plane arrived and he and the male Air Serv agent boarded to assist Mr. Stark.  Lastly, he states the aisle chair arrived later by way of the second Air Serv agent.

c. Air Serv did not use a Slideboard to transfer a Passenger to an Aircraft Seat as required by their training program

i. Air Serv did not use a safety harness to transfer a passenger over an aircraft armrest.

3. Mrs. Stark informed United Airlines well in advance of their travel on October 19, 2102 that her husband would need assistance as suggested by 14 CFR, Part 382.

a. This is documented in the work order and by the Captain's testimony that he called ahead to dispatch for the sole purpose of requesting a jetway and aisle chair.

4.  After a considerable time it became clear that Air Serv would not make available an aisle chair to deplane.  Air Serv suggested that Mr. Stark use his walker to deplane.  The Air Serv agent should be trained to recognize the proper assistance a passenger with a disability needs.  In this regard, it is my opinion, besides what I have stated in number 2, above, the Air Serv Employee failed to recognize or take into consideration the following:

    a.  The passenger's walker would not properly fit into the aircraft aisle without wedging between the bulkhead and the galley.  Further, the walker would not properly fit across the bridge from the airplane to the jetway.  Therefore, the walker could not be expanded for its normal intended use.

    b.  The walker could not be used in front of the passenger due to inadequate legroom between the seat and the bulkhead at seat 1A.

    c.  That company guidelines only account for the use of an aisle chair for deplaning a passenger with a disability whose mobility is so restricted as to need proper assistance to/from aisle chair seat to a wheelchair.

    d.  The DGS agent notes in his statement and testimony that he observed Mr. Stark struggling to deplane using his walker.  The DGS agent and Air Serv agent should have informed Mr. Stark that they could obtain an aisle chair to deplane safely.

5.  On the date of the injury, Air Serv, acting as a contractor for United Airlines, failed to follow established company procedures emphasized in the Air Serv Training Curriculum and CFR 14, 382.151 (c)(1)(2) by not informing Mr. or Mrs. Stark of their right to contact a Complaint Resolution Official (CRO) available either in person or via telephone.

    a.  Air Serv employees failed to follow established training documents that emphasize that any customer with a disability who complains about how they are being handled should immediately be referred to a supervisor and/or an airline Complaint Resolution Official (CRO).

    b.  The DGS agent testified that he was a qualified CRO, but never indicated this to Mr. Stark nor interjected himself to take control of the situation that the Air Serv agent could not handle.

6. ExpressJet Airlines, Inc ("ExpressJet") failed to follow established company procedures emphasized in the ExpressJet Flight Attendant Manual, Pages 8-4.1, 8-4.2, and 8-4.3 and CFR, Part 382.151(c)(1),(2) by not informing Mr. or Mrs. Stark of their right to contact a Complaint Resolution Official (CRO) available in person or via telephone.

   a. ExpressJet flight attendants(s) failed to follow established training documents that emphasize that any customer with a disability who complains about how they are being handled should immediately be referred to a supervisor and/or an airline Complaint Resolution Official (CRO).

   b. When questioned in her deposition it was evident and verified in testimony by Ms. Mathis that she did not know what a Complaint Resolution Official was nor how to contact that individual.

7. ExpressJet Airlines did not inform Air Serv nor Mr. Stark that the walker could not be expanded and used as intended inside the EMB-135ER/LR airplane.  ExpressJet did not inform Air Serv nor Mr. Stark that there was an incline in the aisle from seat 1A to the front of the plane.

   a. These contributed to Mr. Stark's injury because Mr. Stark had to shuffle sideways down the narrow aisle to exit the aircraft with his walker unfolded.

**Materials Relied Upon**

The materials that I relied upon in preparing this report are listed in Exhibit 3. I reserve the right to amend these opinions as new or additional information is provided for my review.

**PERTINENT REGULATORY GUIDANCE**

The Federal Aviation Administration is the national aviation authority of the United States and operates under the Department of Transportation.  It has the authority to regulate and oversee all aspects of American civil aviation.

General rulemaking procedures followed by the FAA are explained in Title 14 of the Code of Federal Regulations (14 CFR) part 11.  Rules for Air Carriers are found in 14 CFR, Subpart A, FARs 119, 121, 125, and 135.  The Department of Transportation (DOT) has issued 14 CFR, Part 382, regulations that address the subject of non-discrimination on the basis of disability in air travel.

**SERVICES AGREEMENT**

United Airlines and Air Serv Corporation (Air Serv) had a services agreement in effect on the date of the incident that was signed on February 8, 2011. This agreement outlines the scope of services that the contractor, Air Serv would perform.  This agreement stipulates that Air Serv will obey all rules and regulations applicable to the locations at which Services are performed.  The agreement stipulates that Air Serv will comply with all applicable Federal, State, local and foreign laws and ordinances and all lawful orders, rules and regulations thereunder, including but not limited to: (d) Part 382 of the regulations of the Department of Transportation.

Exhibit A of the Agreement speaks to training.  It states that United Airlines shall provide all applicable training materials related to United Airlines policies and procedures , in order for the Contractor to accomplish initial training of its employees who will perform work under the agreement.  The contractor will shall ensure that all its employees working under this agreement receive initial/recurrent training and remain in compliance with United Airlines and/or government mandated training.

Under the Scope of Service Summaries in the agreement, wheel chair/special services states that a service agent provides wheelchair and escorting assistance to persons with disabilities in accordance with the Air Carrier Access Act (CFR 14 Part 382).  The Passenger Handling section stipulates Safety steps to follow including item N: Ensure two (2) Vendor Service Representatives are used when a customer is unable to assist in their own wheelchair transfer to/from an aisle chair.

The Services Agreement specifically stipulated Wheelchair Services Training and states:

A. Contractor must have and utilize an established training curriculum that is in compliance with ACAA regulations (14 CFR Part 382).

B. Contractor will maintain and make available upon request all training records for service agent employees working on behalf of united Airlines.

Under the Service Agreement, the contractor, Air Serv, is responsible for obtaining, operating, and maintaining its own equipment necessary to perform the services within the airport facilities including telecommunications service, office equipment and supplies, non-mobile equipment and mobile, non-motorized equipment (wheelchairs, aisle chairs, electric carts, etc.).  Included in the Exhibit are two wheel chair process action diagrams spelling out each step of passenger handling.

## CFR 14 PART 382 REQUIREMENTS THAT PERTAIN TO THIS INCIDENT

The purpose of this part is to carry out the Air Carrier Access Act of 1986, as amended. This rule prohibits both U.S. and foreign carriers from discriminating against passengers on the basis of disability; requires carriers to make aircraft, other facilities, and services accessible; and requires carriers to take steps to accommodate passengers with a disability.  Other sections of Part 382 that pertain to this incident:

§382.15   Do carriers have to make sure that contractors comply with the requirements of this Part?

(a)   As a carrier, you must make sure that your contractors that provide services to the public (including airports where applicable) meet the requirements of this part that would apply to you if you provided the services yourself.

(b)   As a carrier, you must include an assurance of compliance with this part in your contracts with any contractors that provide services to the public that are subject to the requirements of this part. Noncompliance with this assurance is a material breach of the contract on the contractor's part.

(1)   This assurance must commit the contractor to compliance with all applicable provisions of this Part in activities performed on behalf of the carrier.

(2)   The assurance must also commit the contractor to implementing directives issued by your CROs under §§382.151 through 382.153.

(c)   As a U.S. carrier, you must also include such an assurance of compliance in your contracts or agreements of appointment with U.S. travel agents. You are not required to include such an assurance in contracts with foreign travel agents.

(d)     You remain responsible for your contractors' compliance with this part and for enforcing the assurances in your contracts with them.

(e)     It is not a defense against an enforcement action by the Department under this part that your noncompliance resulted from action or inaction by a contractor.

§382.25 As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight.

§382.41   What flight-related information must carriers provide to qualified individuals with a disability?

As a carrier, you must provide the following information, on request, to qualified individuals with a disability or persons making inquiries on their behalf concerning the accessibility of the aircraft expected to make a particular flight. The information you provide must be specific to the aircraft you expect to use for the flight unless it is unfeasible for you to do so (e.g., because unpredictable circumstances such as weather or a mechanical problem require substitution of another aircraft that could affect the location or availability of an accommodation). The required information is:

(a) The specific location of seats, if any, with movable armrests (i.e., by row and seat number);

(b) The specific location of seats (i.e., by row and seat number) that the carrier, consistent with this part, does not make available to passengers with a disability (e.g., exit row seats);

(c) Any aircraft-related, service-related or other limitations on the ability to accommodate passengers with a disability, including limitations on the availability of level-entry boarding to the aircraft at any airport involved with the flight. You must provide this information to any passenger who states that he or she uses a wheelchair for boarding, even if the passenger does not explicitly request the information.

(d) Any limitations on the availability of storage facilities, in the cabin or in the cargo bay, for mobility aids or other assistive devices commonly used by passengers with a disability, including storage in the cabin of a passenger's wheelchair as provided in §§382.67 and 382.123 of this part;

(e) Whether the aircraft has an accessible lavatory; and

The types of services to passengers with a disability that are or are not available on the flight

Subpart E—Accessibility of Aircraft

§382.61   What are the requirements for movable aisle armrests?

(a)     As a carrier, you must ensure that aircraft with 30 or more passenger seats on which passenger aisle seats have armrests are equipped with movable aisle armrests on at least one-half of the aisle seats in rows in which passengers with mobility impairments are permitted to sit under FAA or applicable foreign government safety rules.

(b)     You are not required to provide movable armrests on aisle seats of rows which a passenger with a mobility impairment is precluded from using by an FAA safety rule.

§382.81  For which passengers must carriers make seating accommodations?

(k)   As a carrier, you must provide the following seating accommodations to the following passengers on request, if the passenger self-identifies to you as having a disability specified in this section and the type of seating accommodation in question exists on the particular aircraft. Once the passenger selfidentifies to you, you must ensure that the information is recorded and properly transmitted to personnel responsible for providing the accommodation.

(m)  For a passenger who uses an aisle chair to access the aircraft and who cannot        readily transfer over a fixed aisle armrest, you must provide a seat in a row with a  movable aisle armrest. You must ensure that your personnel are trained in the location and proper use of movable aisle armrests, including appropriate transfer techniques. You must ensure that aisle seats with movable armrests are clearly identifiable.

Subpart G—Boarding, Deplaning, and Connecting Assistance

§382.95  What are carriers' general obligations with respect to boarding and deplaning assistance?

(a) As a carrier, you must promptly provide or ensure the provision of assistance requested by or on behalf of passengers with a disability, or offered by carrier or airport operator personnel and accepted by passengers with a disability, in enplaning and deplaning. This assistance must include, as needed, the services of personnel and the use of ground wheelchairs, accessible motorized carts, boarding wheelchairs, and/or on-board wheelchairs where provided in accordance with this part, and ramps or mechanical lifts.

§382.101  What other boarding and deplaning assistance must carriers provide?

When level-entry boarding and deplaning assistance is not required to be provided under this subpart, you must, as a carrier, provide or ensure the provision of boarding and deplaning assistance by any available means to which the passenger consents. However, you must never use hand-carrying (*i.e.,* directly picking up the passenger's body in the arms of one or more carrier personnel to effect a level change the passenger needs to enter or leave the aircraft), even if the passenger consents, unless this is the only way of evacuating the individual in the event of an emergency.

Subpart J—Training and Administrative Provisions

§382.141   What training are carriers required to provide for their personnel?

(a) As a carrier that operates aircraft with 19 or more passenger seats, you must provide training, meeting the requirements of this paragraph, for all personnel who deal with the traveling public, as appropriate to the duties of each employee.

   (1)   You must ensure training to proficiency concerning:
      (i)   The requirements of this part and other applicable Federal regulations affecting the provision of air travel to passengers with a disability;
      (ii)   Your procedures, consistent with this part, concerning the provision of air travel to passengers with a disability, including the proper and safe operation of any equipment used to accommodate passengers with a disability; and
      (iii)   For those personnel involved in providing boarding and deplaning assistance, the use of the boarding and deplaning assistance equipment used by the carrier and appropriate boarding and deplaning assistance procedures that safeguard the safety and dignity of passengers.

   (2)   You must also train such employees with respect to awareness and appropriate responses to passengers with a disability, including persons with physical, sensory, mental, and emotional disabilities, including how to distinguish among the differing abilities of individuals with a disability.

   (5)   You must ensure that all personnel who are required to receive training receive refresher training on the matters covered by this section, as appropriate to the duties of each employee, as needed to maintain proficiency. You must develop a program that will result in each such employee receiving refresher training at least once every three years. The program must describe how employee proficiency will be maintained.

   (6)   You must provide, or ensure that your contractors provide, training to the contractors' employees concerning travel by passengers with a disability. This training is required only for those contractor employees who deal directly with the traveling public, and it must be tailored to the employees' functions. Training for contractor employees must meet the requirements of paragraphs (a)(1) through (a)(5) of this section.

   (7)   The employees you designate as CROs, for purposes of §382.151 of this part, must receive training concerning the requirements of this part and the duties of a CRO.

   (8)   Personnel subject to training required under this part, who are already employed on May 13, 2009, must be trained one time in the changes resulting from the reissuance of this part.

§382.145   What records concerning training must carriers retain?

(a)      As a carrier that operates aircraft with 19 or more passenger seats, you must incorporate procedures implementing the requirements of this part in the manuals or other guidance or instructional materials provided for the carrier and contract personnel who provide services to passengers, including, but not limited to, pilots, flight attendants, reservation and ticket counter personnel, gate agents, ramp and baggage handling personnel, and passenger service office personnel. You must retain these records for review by the Department on the Department's request. If, upon such review, the Department determines that any portion of these materials must be changed in order to comply with this part, DOT will direct you to make appropriate changes. You must incorporate and implement these changes.

(b)      You must retain for three years individual employee training records demonstrating that all persons required to receive initial and refresher training have done so.

Subpart K – COMPLAINTS AND ENFORCEMENT PROCEDURES

§382.151   What are the requirements for providing Complaints Resolution Officials?

(a)      As a carrier providing service using aircraft with 19 or more passenger seats, you must designate one or more CROs.

(b)      As a U.S. carrier, you must make a CRO available at each airport you serve during all times you are operating at that airport. As a foreign carrier, you must make a CRO available at each airport serving flights you operate that begin or end at a U.S. airport. You may make the CRO available in person at the airport or via telephone, at no cost to the passenger. If a telephone link to the CRO is used, TTY service or a similarly effective technology must be available so that persons with hearing impairments may readily communicate with the CRO. You must make CRO service available in the language(s) in which you make your services available to the general public.

(c)      You must make passengers with a disability aware of the availability of a CRO and how to contact the CRO in the following circumstances:

       (1)      In any situation in which any person complains or raises a concern with your personnel about discrimination, accommodations, or services with respect to passengers with a disability, and your personnel do not immediately resolve the issue to the customer's satisfaction or provide a requested accommodation, your personnel must immediately inform the passenger of the right to contact a CRO and then contact a CRO on the passenger's behalf or provide the passenger a means to do so (*e.g.,* a phone, a phone card plus the location and/or phone number of the CRO available in a format he or she can use.

       (2)      Your reservation agents, contractors, and Web sites must provide information equivalent to that required by paragraph (c)(1) of this section to passengers with a disability using those services who complain or raise a concern about a disability-related issue.

Each CRO must be thoroughly familiar with the requirements of this part and the carrier's procedures with respect to passengers with a disability. The CRO is intended to be the carrier's "expert" in compliance with the requirements of this part.

(d)     You must ensure that each of your CROs has the authority to make dispositive resolution of complaints on behalf of the carrier. This means that the CRO must have the power to overrule the decision of any other personnel, except that the CRO is not required to be given authority to countermand a decision of the pilot-in-command of an aircraft based on safety.

**Express Jet Flight Attendant Manual, Revision 12, Passenger Handling**

Regulation FAR 121.311 – Seat backs must be upright for takeoff and landing, barring certain medical reasons.

The Department of Transportation (DOT) has issued Part 382, regulations that address the subject of non discrimination on the basis of disability in air travel. Part 382 does not replace or overrule existing FAA regulations. ExpressJet will make every effort to provide a safe and pleasant travel experience for every passenger and will not discriminate against any person with a disability.

Policy – Page 8-4.1

The Air Carrier Access Act,  CFR 14 Part 382 prohibits discrimination in air travel on the basis of a disability, and ExpressJet fully complies with the regulations. ExpressJet will not refuse transportation to any person with a disability on the basis of his or her disability or because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers. Always use common sense and good judgment in dealing with all situations and, as a general rule, strive to support the passenger.

See the passenger, not the disability!

•     ExpressJet may not deny boarding to any passenger on the basis of disability or because the disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers; or because of a communicable disease or infection which, according to Federal Public Health Authority, is not transmittable during the normal course of flight.

•     Federal law does allow a carrier to deny boarding to a passenger with a disability who would jeopardize the safety of the flight. If a passenger disability is refused transportation on the basis of safety, the Complain Resolution Official (CRO) should immediately file a report.

Page 8-4.2

Complaint Resolution Official (CRO)

The CRO has the authority and responsibility to resolve issues related to qualified individuals with a disability on behalf of ExpressJet. According to 14 CFR Part 382, a CRO must be available during flight operations, whether in person or via telephone. Resolving a disability related issue at the time of travel is preferred, rather than allowing a complaint to escalate to the DOT. CRO agents must be proficient in 14 CFR Part 382 and its application in order to mitigate passenger complaints when other station personnel are unable.

Page 8-4.3

Flight Attendant Responsibilities

Flight Attendants must provide services within the aircraft cabin as requested by or on behalf of individuals with a disability. Passengers with disabilities cannot be required to accept special services, including pre-boarding, except where safety is involved, however assistance should always be offered.

Boarding/Deplaning

- If requested, ExpressJet will provide boarding and deplaning assistance to passengers with disabilities,
including assistance in making connection to other carriers.

Page 8-4.4

Seating

- The passenger should be able to occupy a regular customer seat in an upright position during takeoff and landing with seatbelt fastened. FAR 121.311 provides for carriage of an individual who, for medical reasons, is unable to sit completely upright.

- Passengers with disabilities are not excluded from occupying any seat on the aircraft as long as they meet the qualifications for that assigned seat (see Exit Row Seating Criteria).

- There is no limit to the number of passengers who are disabled that may be accepted on a flight.

- A passenger who cannot readily transfer over a fixed aisle armrest must be provided a seat in a row with a movable aisle armrest.

**AIRSERV TRAINING PROGRAM DOCUMENT & SLIDES PERTINENT TO THIS INCIDENT**

AIR SERV CUSTOMERS WITH DISABILITIES DOCUMENT – TRAINING DOCUMENT

Page 49 – Complaint Resolution Official

- o Carriers must make a CRO available to address disability-related problems.
  - By Telephone or in person
  - At all times carrier operates at airport under 382.151 o When do we involve a CRO
    - If the air traveler with the disability
      - • Complains of alleged or potential violation of the law
      - • Requests a CRO Manager, supervisor, etc.
    - If we need to contact a CRO for information or advice. o It is also important to remember to summon a Supervisor if you run into a situation that is out of the ordinary (or might require you to break one of the guidelines we have discussed in class). We have radios and phones available to our attendants for this very purpose
- o If your customer is unhappy in any way or voices complaints about how the airline, airport, or Air Serv has treated them, immediately refer our customer to your supervisor and/or airline Customer Resolution Official or CRO.  Under the ACAA, all carriers must hae a customer complaint/resolution process and have a CRO available for our customer to contact (either in person or by telephone).  So, know to whom you should refer a complaint.

Page 72 - Customers with disabilities – Just Ask, then Listen, Always

Page 73 - Treating Customers with reduced mobility with respect

- Communicate directly with our customer (one of 6 bullets) – teat with empathy not sympathy.

Page 74 - Appropriate interaction and communication with or about those with disabilities

- Wait for instructions on the help needed and follow the instructions

Page 109 - Aisle Chair Slides start on page 109 with the slide labeled Passenger Service Safety Training – STAXI

- Statement on Slide "ALWAYS, ALWAYS, ALWAYS Use an Aisle chair to move a passenger onto and off aircraft.

Page 110 – Still titled Passenger Service Safety Training – Staxi

- Statement on slide "Always, Always, Always use a Slideboard to transfer a Passenger to an Aircraft Seat."

Page 111 – Still titled Passenger Service Safety Training – Staxi

- Statement on slide – "Always, Always, Always, use a safety harness to transfer a passenger over an aircraft armrest"

## MONTREAL CONVENTION

Article 17(1) - "The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or bodily injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

## Captain's Statement

Captain of Flt. 4179 witnessed very slow boarding of Mr. Stark at origin station of Shreveport, LA (SHV).  He determined the need to contact his dispatcher to communicate to Houston Operations (IAH) that the arrival of Flight 4179 required an easier method of transferring Mr. Stark off the aircraft.  IAH Operations changed the gate from B84 to A8 that had a jetway.

The Captain remained in his seat believing wheelchair assistants and the gate agent were assisting Mr. Stark from the aircraft.  He did not realize the passenger had fallen to the floor, but when he became aware he continued to assist Mr. Stark.  He was informed by the flight attendant that the man fell because the wheelchair assistant didn't use an aisle chair but instead encouraged the man to try and use his walker.  Mr. Stark could not support his weight and collapsed to the floor.

## Captain's Deposition

The Captain doesn't deny that the flight attendant told her the crucial last two sentences in his report – he just doesn't remember it now.  He would defer to the statement as he wrote it very closely in time to the actual incident.

There are no reporting standards as to what goes into his statement.

Captain called ahead to dispatch to specifically request a jetway and aisle chair for Mr. Stark.

## Flight Attendant Statement

Mr. Stark had an aisle chair for boarding in Shreveport and was put into seat 1A as it was too much of a struggle to go further.  He used a cane from the chair to his seat.  He asked to have his walker available upon landing versus the aisle chair as he did not want to be picked up anymore.  The arrival gate did not have a jetway, only a retractable ramp.  The wheelchair guy came on and tried to help him out of his seat to use his walker but Mr. Stark struggled to get out

of his seat because of the immovable armrest and he lost his balance and fell.  Paramedics were called because no one showed up after being called.

**Flight Attendant Deposition**

Ms. Mathis, while only having limited recall of the accident did confirm that only one Air Serv attendant was initially available.  She also stated her unfamiliarity with the use of a Complaint Resolution Official.

**Delta Global Service – John Hammond Statement**

DGS employee stated that a wheelchair and an aisle chair were standing by upon Flt. 4179 arrival. Besides the DGS gate agent employee, one Air Serv agent was available when the flight arrived and another arrived at a later time (not specified in his report). He states that the walker was in the aisle around seat 2 when Mr. Stark tried to get up and use his walker.  He later stated that the walker had been wedged in the aisle.

**Delta Global Service – John Hammond Deposition**

He cannot verify if there was actually an aisle chair present when he and the single Air Serv agent boarded to assist Mr. Stark.

He stated he "encourages people to use aisle chairs."  He stated it took Mr. Stark about five minutes from starting to get up to finally falling down.  During that time he didn't do anything to physically assist Mr. Stark, didn't ask/encourage if Mr. Stark wanted to use the aisle chair, didn't do anything but observe.

Was a qualified CRO but never made this fact known to anyone.

He doesn't remember whether Sally/Charles Stark asked for the aisle chair.

No reporting standards as to what goes into his statement/incident report.  Stated it was his duty to create the incident report shortly after incident, but says he didn't do that because a Delta employee were getting arrested for drugs.  However, he played no role in the arrest or aftermath, and could have done it that same day.

**Air Serv Dispatcher, Ms. Jessica Thomas' Telephone Intereview**

Ms. Jessica Thomas was the dispatcher on duty at the time of the accident.  Her statement puts the Air Serv response and after action reporting in perspective.

**Mrs. Stark & Keith Stark E-Mails/Statements**

July 17, 2012 – Mrs. Stark wrote advising that there were issues on a flight on May 21, 2012 and she hoped they would not experience the same issues in October when they were scheduled to fly again.

Sept. 26, 2012 – Mrs. Stark trying to confirm that her husband would be needing assistance on the flight from Shreveport on October 19, 2012 and from Mexico on November 2, 2012.

October 23, 2012 – Keith Stark wrote to United Customer care regarding the incident.  The following statements were made:

- Starks were told no aisle chair was available for them to use upon arrival at IAH.
- One person sent aboard to help Mr. Stark, but without an aisle chair.
- Mr. Stark was dropped by the Air Serv agent.

Mrs. Stark recounted the incident at the Houston International Airport on October 19, 2102.  The following statements were made:

- The pilot called ahead to Houston to make sure there was a jetway available.
- When we arrived, the jetway had a bridge out to the plane and United sent only one man and no aisle chair to deplane my husband.
- The end result is that he was dropped and they had to call the paramedics, who determined he had a sprained ankle.
- We continued on to Puerto Vallarta, where my husband went to the hospital and he had a severely broken leg above the ankle.

## CLOSING COMMENTS

Therefore, I state with reasonable probability that Air Serv, as a contractor for United Airlines, did not handle Mr. Stark according to regulatory requirements, the United and Air Serv Corporation Services Agreement or established Air Serv training standards.

Similarly, ExpressJet Airways, Inc. employees failed to follow their established training documents in providing assistance to a customer with a disability nor did they provide proper information to a customer with a disability who complains about how they are being handled as spelled out in their training documents.   Together, these acts or omissions by ExpressJet, United, and Air Serv directly led to an "accident" as that term is defined under the Montreal Convention and were the cause of Mr. Stark's injuries as a passenger aboard a United Express aircraft on October 19, 2012.

Respectfully Submitted,

Robert A. Nester

EXHIBIT 1

<u>CURRICULUM VITAE – ROBERT A. NESTER</u>

EDUCATION

- Bachelor of Science – Aeronautical Administration Parks College of St. Louis University 1963
- Air Force Undergraduate Pilot Training – 1965
- Professional Military Education – U. S. Air Force – through Air War College – 1991.

MILITARY SERVICE

- United States Air Force – July 1963 through February 1971
- Air Force Reserves – February 1971 through April 2000
- Retirement – April 1, 2000 – Major General
- Combat Sorties – 181
- Aircraft Flown – T-37, T-38, T-33, F-4C, F-4D, A-37A, A-37B, A-10, F-16, F-15, C-5, C-130, KC-135,    KC-10.

EMPLOYMENT HISTORY

- Eastern Airlines – 1972 – 1989 – Captain, Co-Pilot, Flight Engineer
- DHL Airlines – 1991 – Co-Pilot
- Transtar Airlines – 1993 – 1994 – Co-Pilot; Captain
- LeisureAir Airlines – 1994-1995 – Captain, Check Airman
- Midway Airlines – 1995-1996 – Co-Pilot; Captain
- Federal Aviation Administration – 1996 – 2007 – Aircrew Program Manager, Principle Operations
  Inspector, ○ Air Carrier Certification, Certification of New Aircraft on Certificates, Polar
     Operations, Long Range Navigation, Accident Investigations.

AERONAUTICAL RATINGS

- Air Line Transport
- Flight Engineer – Turbojet Powered
- Flight Instructor – Airplanes and Instruments

AIRCRAFT TYPE RATINGS

- B-757; B-767; DC-8; DC-9; DC-10; FK-100; L-1011

FLIGHT EXPERIENCE

- TOTAL FLIGHT TIME – 26,083.7 HOURS ○ Military Pilot– 5,661.5 hours
  - Pilot in Command – 2953.2 hours
  - Second In Command – 224.7 hours
  - Instructor Pilot – 2078.7 hours
  - Student Pilot – 247.9 hours
  - Simulator Time – 157.0
  ○ Civilian Pilot – 13,737.2 hours
  - Pilot in Command – 6,631 hours
  - Flight Examiner/Evaluator – 2692.0 hours ○ Flight Engineer – 6685.0 hours

AVIATION CONSULTANT – PILOT AND FAA EXPERT

- Expert Aviation Consultants – 2008 to present

<u>EXHIBIT 2</u>

<u>HISTORY OF WORK AS EXPERT WITNESS FOR EXPERT AVIATION CONSULTANTS</u>

Elliott Schulman vs. West Jet management LLC, Phoenix, AZ, 11-6-2008.  Gallagher and Kennedy Law Offices, 2575 East Camelback Road, Phoenix, AZ 85016.  Contact: Mr. Jeffrey Gross – Settled out of Court

Stephen Jensen vs Modern Aero, Inc, Arthur Chapman Law Office File No. 38304, Minneapolis, MN 11-112008 – Date of Loss 7-4-05. Arthur Chapman, Kettering Smetak and Pikala, P.A. Attorneys at Law, 500 Youn Quinlan building, 81 south Ninth Street, Minneapolis, MN 55402. Contact:  Barbara Benton, Paralegal

Elliott vs. Spectrum Health Systems, et al Kent Co., MI Docket # 11-04691-CZ  2-24-2012 – Settled out of Court,. Nagi, Baxter and Seymour, P.C., Attorneys and Counselors at Law, 155 West Congress, Suite 300,
Detroit, MI 48226 – Settled out of Court

John TH Doe vs. Roman Catholic Archbishop of Los Angeles, CA Case No. JCCP 4286, Deposition on 6-52012.  Manly and Steward Law Firm, 4220 Von Karman Avenue, Suite 200, Newport Beach, CA 92660.  Contact Mr. Vince Finaldi. Settled out of Court

Hoggatt vs. Harris, Civil Action No. 6:11-DV-91, Eagle, CO - Beach B60 Fatal Crash 12-20-2012 – Settled out of Court.  Law, Snakard & Gambill, attorneys and Counselors, 777 Main Street, Suite 3500, Fort Worth, TX 76102.  Contact Mr. Ed Huddleston. Settled Out of Court

Continental Connection Flight 3407; Accident near Clarence Center, New York, February 12, 2009. Retained by Condon and Forsyth LLP.  Condon and Forsyth Case Reference: DJH/2240.07233. Deposition on 1/29/2014 – offices of Condon and Forsythe, 7 Times Square, New York, NY 10036. Contact: Ms. Diana Gurfel.  Settled Out of Court in 2014.

## EXHIBIT 3 MATERIALS RELIED UPON

1. Code of Federal Regulations CFR 14, Part 121 - Operating  Requirements: Domestic, Flag, and Supplemental Operations
2. Code of Federal Regulations CFR 14, Part 382 – Rule that enforces compliance with Air Carrier Access Act.
3. Express Jet Flight Attendant Manual, Revision 12.
4. United Airlines and Air Serv Corporation Service Agreement
5. Air Serv Corp. Training Program and Standards
6. E-Mails/Statements from Keith Stark and Sally Stark
7. Captain's Statement Following the Incident
8. Flight Attendants Statement following the Incident
9. Delta Gate Service Employee Statement
10. Express Jet Flight Attendant Michelle Mathis' deposition.
11. Phone Conversation information provided by Air Serv Dispatcher Ms. Jessica Thomas
12. Montreal Convention